## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant WARNER BROS. DISCOVERY, INC., | |
| Plaintiff, | Case No. 1:24-cv-09885 |
| v. | JURY TRIAL DEMANDED |
| DAVID ZASLAV, SAMUEL A. DI PIAZZA, JR., LI HASLETT CHEN, RICHARD W. FISHER, PAUL A. GOULD, DEBRA L. LEE, KENNETH W. LOWE, JOHN C. MALONE, FAZAL MERCHANT, PAULA A. PRICE, GEOFFREY Y. YANG, and GUNNAR WIEDENFELS, | |
| Defendants | |
| and | |
| WARNER BROS. DISCOVERY, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Warner Bros. Discovery, Inc. ("WBD" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among

other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding WBD, legal filings, news reports, securities analysts' reports about the Company, the securities class action captioned *Collura v. Warner Bros. Discovery, Inc. et al*, 1:24-cv-09027 (S.D.N.Y.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of WBD against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties from at least February 23, 2024 and August 7, 2024 (the "Relevant Period"), as set forth below.

2.     WBD is an American multinational mass media and entertainment conglomerate, formed following a merger between Discovery, Inc. and WarnerMedia. The Company classifies its operations into three reportable segments: (i) Studios – which primarily consists of the production and release of feature films and production and initial licensing of television programs; (ii) Networks – primarily consisting of domestic and international television networks such as TNT, TBS, Discovery Channel, and CNN; and (iii) DTC – WBD's direct-to-consumer offerings and streaming services such as Max, HBO Max, and discovery+.

3.     Within the Networks segment, the Company's TNT Sports network holds video rights to several major sports leagues, including the National Basketball Association ("NBA"),

---

[1] The Individual Defendants are David Zaslav ("Zaslav"), Samuel A. Di Piazza, Jr. ("Di Piazza"), Li Haslett Chen ("Chen"), Richard W. Fisher ("Fisher"), Paul A. Gould ("Gould"), Debra L. Lee ("Lee"), Kenneth W. Lowe ("Lowe"), John C. Malone ("Malone"), Fazal Merchant ("Merchant"), Paula A. Price ("Price"), Geoffrey Y. Yang ("Yang"), and Gunnar Wiedenfels ("Wiedenfels"). "Defendants" means WBD and the Individual Defendants.

Major League Baseball ("MLB"), National Collegiate Athletic Association ("NCAA"), National Hockey League ("NHL"), and United States Soccer Federation ("USSF"), among others. Under its existing 2014 deal with the NBA, TNT paid an annual average fee of $1.2 billion.

4.     As existing content deals neared expiration, WBD was unable to reach a new deal with the NBA before its exclusive negotiating window ended in April 2024. Thereafter, the NBA entered advanced discussions with its various partners for a new round of media-rights deals that would last approximately a decade. The *Wall Street Journal*, for instance, reported in April 2024 that Comcast's NBCUniversal prepared an offer to pay an annual average fee of $2.5 billion. It was also widely reported that Amazon had offered to pay an annual average fee of $1.8 billion.

5.     As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly touted the Company's "solid footing with a clear pathway to growth," and a "confiden[ce] in [their] ability to drive sustained operating momentum and enhanced shareholder value." With respect to NBA video rights, the Individual Defendants boasted of the Company's "strong positive 40-year relationship with the NBA[,]" noting WBD was "fully engaged in renewal discussions[.]" In reality, uncertainty around NBA rights renewals, continued softness in U.S. advertising markets, and differences between the Company's market capitalization and book value were causing, or likely to cause, the Company to significantly reevaluate its business and goodwill.

6.     On July 24, 2024, the NBA announced new or renewed media deals with NBCUniversal, Amazon, and The Walt Disney Company. The 11-year media rights agreements are worth between $1.8 billion and $2.6 billion annually, or a combined $77 billion across the three networks.

7.     The full truth emerged on August 7, 2024, when WBD issued a press release announcing financial results from the second quarter 2024. The press release reported

disappointing revenue of $9.71 billion, representing a 6.3% year-over-year decrease, as well as a net loss of approximately $10 billion because of a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects. The Company disclosed that the goodwill impairment charge was "triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA."

8.    On this news, the Company's stock price declined, from $7.71 to close at $7.02 on August 8, 2024, or 8.95%.

9.    As set forth herein, throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose: (i) negotiations for media rights with the NBA were causing, or likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) WBD's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) as a result, WBD faced an increasing likelihood of incurring billions of dollars in goodwill impairment charges; and (iv) as a result of the foregoing, WBD had overstated its overall business and financial prospects. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

10.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11.    As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Zaslav and Wiedenfels on November 25, 2024, in the United States District Court for the Southern District of New York.

12.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

13.    Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of WBD's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and SEC Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder.

15.    Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, WBD is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

### *Plaintiff*

20.     Plaintiff is, and has been at all relevant times, a shareholder of WBD.

### *Nominal Defendant*

21.     Nominal Defendant WBD is a Delaware corporation with its principal executive offices located at 230 Park Avenue South, New York, New York 10003.  WBD's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "WBD."

### *Individual Defendants*

22.     Defendant Zaslav has served as a member of the Board since 2008 and as the Company's President and Chief Executive Officer ("CEO") since April 2022. Defendant Zaslav previously served as President and CEO of Discovery, Inc. from January 2007 to April 2022. As

set forth in the proxy statement filed by WBD with the SEC on April 19, 2024 (the "2024 Proxy"), Zaslav received $49,702,546 in compensation from the Company in 2023. Defendant Zaslav is also named as a defendant in the Securities Class Action.

23.     Defendant Di Piazza has served as a member of the Board and as Board Chair since 2022. Defendant Di Piazza also serves as a member of the Board's Audit Committee. According to the 2024 Proxy, Di Piazza received $534,207 in compensation from the Company in 2023.

24.     Defendant Chen has served as a member of the Board since 2022. Defendant Chen also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2024 Proxy, Chen received $354,186 in compensation from the Company in 2023.

25.     Defendant Fisher has served as a member of the Board since 2022. Defendant Fisher also serves as a member of the Board's Nominating and Corporate Governance Committee and Compensation Committee. According to the 2024 Proxy, Fisher received $379,186 in compensation from the Company in 2023.

26.     Defendant Gould has served as a member of the Board since 2008. Defendant Gould also serves as Chair of the Board's Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy, Gould received $389,186 in compensation from the Company in 2023.

27.     Defendant Lee has served as a member of the Board since 2022. Defendant Lee also serves as a member of the Board's Compensation Committee. According to the 2024 Proxy, Lee received $359,186 in compensation from the Company in 2023.

28.     Defendant Lowe has served as a member of the Board since 2023, after having previously served as a member of the Board from 2018 to 2022. Defendant Lowe also serves as a

member of the Board's Audit Committee and Compensation Committee. According to the 2024 Proxy, Lowe received $342,936 in compensation from the Company in 2023.

29.    Defendant Malone has served as a member of the Board since 2008. Defendant Malone previously served as CEO and Chairman of the Board of Discovery Holding Company from 2005 to 2008, when it merged with Discovery, Inc. Defendant Malone also serves as Chair of the Board's Nominating and Corporate Governance Committee. According to the 2024 Proxy, Malone received $361,686 in compensation from the Company in 2023.

30.    Defendant Merchant has served as a member of the Board since 2022. Defendant Merchant also serves as a member of the Board's Audit Committee and Nominating and Corporate Governance Committee. According to the 2024 Proxy, Merchant received $374,222 in compensation from the Company in 2023.

31.    Defendant Price has served as a member of the Board since 2022. Defendant Price also serves as Chair of the Board's Audit Committee. According to the 2024 Proxy, Price received $399,186 in compensation from the Company in 2023.

32.    Defendant Yang has served as a member of the Board since 2022. Defendant Yang also serves as a member of the Board's Compensation Committee. According to the 2024 Proxy, Yang received $364,198 in compensation from the Company in 2023.

33.    Defendant Wiedenfels has served as the Company's Chief Financial Officer ("CFO") since 2022, after having previously served as CFO of Discovery, Inc. According to the 2024 Proxy, Defendant Wiedenfels received $17,056,970 in compensation from the Company in 2023. Defendant Wiedenfels is also named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.    By reason of their positions as officers and/or directors of WBD, and because of

their ability to control the business and corporate affairs of WBD, the Individual Defendants owed WBD and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage WBD in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of WBD and its shareholders.

35.     Each director and officer of the Company owes to WBD and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of WBD, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.     To discharge their duties, the officers and directors of WBD were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of WBD, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40.    To discharge their duties, the officers and directors of WBD were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of WBD were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York, Delaware, and the United States, and pursuant to WBD's own Code Ethics (the "Code of Ethics") and Corporate Governance Guidelines;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how WBD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of WBD and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that WBD's operations would comply with all applicable laws and WBD's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41.    Each of the Individual Defendants further owed to WBD and the shareholders the duty of loyalty requiring that each favor WBD's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42.     At all times relevant hereto, the Individual Defendants were the agents of each other and of WBD and were at all times acting within the course and scope of such agency.

43.     Because of their advisory, executive, managerial, and directorial positions with WBD, each of the Individual Defendants had access to adverse, non-public information about the Company.

44.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WBD.

<u>**WBD'S CODE OF ETHICS**</u>

45.     WBD's Code of Ethics opens with a message from the Company's CEO, Defendant Zaslav, stating that among what "sets [the Company] apart" from its industry peers is WBD's "culture, built on foundational values and business practices, as outlined in our Code of Ethics, that promote proper conduct, tolerance, respect, honesty and integrity in the workplace." Defendant Zaslav further instructs that "[i]t is the responsibility of every Warner Bros. Discovery employee to adhere to the highest standards of ethical and professional behavior by acting in accordance with our Code of Ethics."

46.     The Code of Ethics applies to all directors, officers, executives and employees of the Company, who are each required to follow the Code of Ethics as part of their employment.

47.     The Code of Ethics further instructs that violations of the Code of Ethics, the Company's policies and/or applicable laws "may subject employees to disciplinary action up to and including termination. Depending on the nature of the violation, employees may also be subject to financial damages and criminal prosecution."

48.     In a section titled "Complying with Laws and Regulations," the Code of Ethics states that "[c]omplying with the law is the minimum standard for ethical conduct and we are

committed to full compliance with all laws and regulations that apply to our business."

49.    In a section titled "Integrity of Financial Disclosures and Public Disclosure," the Code of Ethics provides, in relevant part:

> Our financial records serve as a basis for managing our business and fulfilling our responsibilities to shareholders, our employees and other stakeholders. The integrity of our financial records is also important to our compliance with accounting, tax and public disclosure laws and regulations and other requirements. We are committed to maintaining accurate and complete financial records and to full, fair, accurate, timely and understandable disclosure in reports and documents that are filed with the U.S. Securities and Exchange Commission and other regulatory bodies or are otherwise made publicly available.
>
> Individually, we are all responsible for recording clear, accurate and honest information in all Company records that we produce, such as expense reports, financial statements and public disclosure documents.
>
> If you have any concerns about questionable accounting or audit matters, you should immediately contact the Ethics & Compliance Office or Internal Audit. You may submit your concerns anonymously where permitted by law. It is essential for the Company to learn about possible accounting or audit concerns so we can investigate them promptly. When in doubt, speak up. The Company does not tolerate any acts of retaliation for good faith reports of accounting or audit concerns.

50.    With respect to "Insider Trading," the Code of Ethics states, in relevant part:

> In the course of business, you may learn confidential information about the Company or about other publicly traded companies that is not available to the public. Don't share material nonpublic information with anyone, including coworkers (unless it is essential for Company-related business), friends or family. Buying or selling the stock of a publicly traded company while aware of material nonpublic information, or sharing such information with others who then buy or sell the stock ("tipping"), is prohibited by various laws, and even casual conversations could be viewed as illegal "tipping" of inside information.
>
> **Material information** is the kind of information a reasonable investor would take into consideration when deciding whether to buy, sell or hold a stock.

### <u>WBD'S CORPORATE GOVERNANCE GUIDELINES</u>

51.    WBD's Corporate Governance Guidelines were adopted to "assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company and its stockholders."

52.    In a section outlining Board director responsibilities, the Corporate Governance Guidelines state, among other things:

a) <u>Oversee Management of the Company</u>. The Board believes that the primary responsibilities of directors are to exercise their business judgment in good faith, to act in what they reasonably believe to be the best interest of all stockholders, and to ensure that the business of the Company is conducted so as to further the long-term interests of its stockholders. The Company's business and affairs are managed under the Board's direction rather than managed by the Board. The Board performs its oversight function in a manner that respects the distinct roles of the Board and management so as not to disrupt the Company's day-to-day operations.

53.    Under a section titled "Conflicts of Interest," the Corporate Governance Guidelines state, in relevant part:

a) <u>Ethics and Conflicts of Interest</u>. The Company has adopted a Code of Ethics (the "Code") that is applicable to all of its directors, officers and employees. Directors are expected to be familiar with and to adhere to the Code, including, for example, its provisions governing conflicts of interest. If a director has an actual or potential conflict of interest (which includes being a party to a proposed "related person transaction"), the director should promptly inform the CEO, the General Counsel and the Chair of the Nominating and Corporate Governance Committee. Directors should recuse themselves from any decision by the Board or a Board committee that involves or affects their personal, business or professional interests. The Nominating and Corporate Governance Committee or such other independent committee of the Board designated by the Board will resolve any conflict of interest issue involving a director or the CEO or any other executive officer of the Company. No related person transaction may be effected by the Company without the approval of the Nominating and Corporate Governance Committee or such other independent committee of the Board designated by the Board to resolve the conflict of interest. For purposes of these Guidelines, a "related person transaction" refers to any transaction which the Company would be required to disclose pursuant to Item 404 of Regulation S-K.

### WBD'S AUDIT COMMITTEE CHARTER

54.    WBD's Audit Committee Charter states that the purpose of the Audit Committee is to "provide assistance to the Board in fulfilling the Board's responsibilities to the Company and its stockholders relating to the accounting, financial reporting process, internal controls and the

audit of the Company's financial statements." In doing so, the Audit Committee is tasked with general oversight of management's processes and activities relating to:

- maintaining the reliability and integrity of the Company's accounting policies, internal controls, financial reporting practices and financial statements;

- the independent auditor's qualifications and independence;

- the performance of the Company's internal audit function and independent auditor;

- confirming compliance with U.S. Federal securities laws and regulations, and the requirements of any stock exchange or quotation system on which the Company's securities may be listed; and

- public disclosures related to environmental, social and governance ("ESG") matters.

55.    In a section titled "Authority and Responsibilities," the Audit Committee Charter states that the Audit Committee has the following duties and responsibilities with respect to "Financial Statement and Disclosure Matters":

F.    Audited Financial Statements. The Committee shall review and discuss with management and the independent auditor the Company's annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's review of the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

G.    Interim Financial Statements. The Committee shall review and discuss with management and the independent auditor the Company's quarterly financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Forms 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

H.    Review of Financial Disclosures. The Committee shall review and discuss with management and the independent auditor, as applicable, (A) significant issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial

statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; (D) any other financial disclosures prior to their inclusion in the Company's Form 10-K or Forms 10-Q to determine that management and the independent auditor are satisfied with the disclosure and content of the financial statements to be presented; and (E) earnings press releases prior to their public release, including the use of non-GAAP financial measures, as well as financial information and earnings guidance (generally or on a case-by-case basis) provided to analysts and rating agencies.

I.   <u>Review of Independent Auditor Reports</u>. The Committee shall, at least quarterly, review and discuss reports from the independent auditor on (A) all critical accounting policies and practices to be used; (B) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and treatments preferred by the independent auditor; and (C) other material written communications between the independent auditor and management, such as any material or significant control recommendations or schedule of unadjusted differences.

J.   <u>Audit Committee Report</u>. The Committee shall prepare the Audit Committee report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

56.    With respect to "Controls and Procedures," the Audit Committee's functions and responsibilities include:

K.   Risk Management. The Committee shall discuss with management the Company's significant business risk exposures including those related to (i) financial reporting and accounting risk, (ii) legal and regulatory risk, (iii) cybersecurity and information technology risk, and (iv) the steps management has taken to monitor and control such risk exposures, including the Company's risk assessment and risk management policies or guidelines. As appropriate, the Committee shall review such matters with the Board.

L.   <u>Review of Conduct of Audit</u>. The Committee shall review and discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU § 380, as amended) relating to the conduct of the audit or any review services, including any difficulties encountered in the course of the audit or review work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

M.   <u>Certifications</u>. The Committee shall review disclosures made to the

Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10- K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

## SUBSTANTIVE ALLEGATIONS

57.     WBD's Networks segment primarily consists of its domestic and international television networks, including TNT. Under its existing 2014 deal with the NBA, TNT paid an annual average fee of $1.2 billion.

58.     In 2024, the NBA entered advanced discussions with its various partners for a new round of media-rights deals that would last approximately a decade.

59.     On February 23, 2024, WBD issued a press release announcing financial and operating results from the fourth quarter and full year 2023. The press release quoted Defendant Zaslav as stating, in relevant part, that "[a]fter executing against our strategic plan to reposition the company, we are now on solid footing with a clear pathway to growth." Defendant Zaslav was further quoted as stating that the Company "[had] an attack plan for 2024 that includes the roll-out of Max in key international markets, a more robust creative pipeline across our film and TV studios, and further progress against our long-range financial goals and are confident in our ability to drive sustained operating momentum and enhanced shareholder value."

60.     With respect to the Company's Networks segment, under a section detailing highlights from the fourth quarter 2023, the press release noted, in relevant part:

- Networks operating expenses decreased 7% ex-FX[2] to $2,829 million compared to the prior year quarter. The AT&T SportsNet business exit favorably impacted the year-over-year growth rate by approximately 300 bps(12)[.]

---

[2] References to "ex-FX" in WBD's financial statements refer to the exclusion foreign exchange rate effects.

o Costs of revenues decreased 7% ex-FX, primarily driven by lower international sports rights fees, including the transfer of TNT Sports Chile, exiting the AT&T SportsNet business, as well as lower domestic general entertainment content expense, partially offset by the impact of inflation in Argentina.

o SG&A [selling, general, and administrative] expenses decreased 4% ex-FX, primarily driven by lower personnel expenses.

61.    Also on February 23, 2024, the Company hosted an earnings call with investors and analysts to discuss fourth quarter and full year 2023 results. During the call, Defendant Zaslav asserted, among other things, that "[o]ur top priority this year was to get this company on solid footing and on a pathway to growth, and we've done that"; that "[w]e've significantly enhanced the efficiency of the organization with a long runway still to go"; and that "[w]e are optimistic that the efforts we've undertaken on digital and advanced advertising solutions . . . will enable us to achieve a more competitive profile[.]" Defendant Zaslav further stated that "[b]ottom line, we're a far healthier company now," "we're building real momentum", "[a]nd we expect 2024 will be a year to drive that momentum forward even further" notwithstanding "the impacts of ongoing disruption in the pay-TV ecosystem and a dislocated linear advertising ecosystem."

62.    With respect to NBA-related content, Defendant Zaslav stated, in relevant part:

Last weekend we saw great coverage and strong ratings at the NBA All-Star Game and All-Star Weekend. We have a strong positive 40-year relationship with the NBA. And in terms of our NBA rights, we are now fully engaged in renewal discussions, and they are constructive and productive. Our global sports portfolio continues to provide real meaningful value to all of our platforms. We're proud to be the home of one of the most coveted collections of premium sports content in the industry, along with a best-in-class talent roster and exceptional production values.

63.    Also during the call, one analyst asked, with respect to the NBA conversations, "[h]ow do you think about making that work financially for the company" given "that linear TV is under pressure on the revenue side, and I think it's probably safe to say the NBA costs are going to go up", and "how do you guys approach this from a kind of a P&L [profit and loss] point of

18

view when you think about exploiting the NBA for what I imagine will be another long-term deal?"

In response, Defendant Wiedenfels stated, in relevant part:

> [O]n the NBA, as you know, we're in the middle of exclusive discussions here, so I want to lift it up maybe one level to a general statement on how we look at sports rights. We're spending close to $20 billion sort of, on content and programming in the broadest sense, and every dollar we spend plays a different role across the portfolio. We generally like to own our content. That's not the case with sports, but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. We're going -- we know exactly what value we assign and we stay disciplined during our discussions.
>
> And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which, you're right, you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way.

64.    The same day, WBD filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Zaslav, Chen, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, Yang, and Wiedenfels. Defendants Zaslav and Wiedenfels each also provided signed certifications pursuant to the Sarbanex-Oxley Act of 2002 that the information contained in the 2023 10-K "fairly presents, in all material respects, the financial condition and results of operations of Warner Bros. Discovery[,]" and also certifying that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

65.    With respect to the Company's 2023 goodwill impairment analysis, the 2023 10-K stated, in relevant part:

*2023 Impairment Analysis*

As of October 1, 2023, the Company performed a quantitative goodwill impairment assessment for all reporting units. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded . . . . [T]he Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The fair values of the reporting units were determined using a combination of DCF [discounted cash flow] and market valuation methodologies. Due to [*inter alia*] declining levels of global GDP growth, [and] soft advertising markets in the U.S. associated with the Company's Networks reporting unit . . . the Company will continue to monitor its reporting units for changes that could impact recoverability.

66. The 2023 10-K also contained generic, boilerplate representations regarding WBD's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed" stating, in relevant part:

We face significant competition to acquire and maintain licenses to sports programming, which leads to significant expenditure of funds and resources. As a result of an increasing number of market entrants in the programming space, we have seen upward pressure on programming costs in recent years, particularly in connection with the licensing and acquisition of sports content from third parties. We may also be impacted by such upward pressures driven by increasing investment in programming by competitors . . . . There can be no assurance that we will be able to compete successfully in the future against existing or new competitors to obtain and/or maintain licenses to recurring sports events, or that increasing competition for programming licenses . . . will not have a material adverse effect on our business, financial condition or results of operations.

There can also be no assurance that we will recoup our investment in sports programming, including realizing any anticipated benefits of our joint ventures. The impact of these contracts on our results of operations over the term of the contracts depends on a number of factors, including the strength of advertising markets and subscription levels and rates for programming. Our success with sports programming is highly dependent on consumer acceptance of this content and the size of our viewing audience.

67. The 2023 10-K also contained generic, boilerplate representations regarding WBD's potential future "recogni[ition of] . . . impairment charges related to goodwill and other intangible assets", while downplaying the likelihood of the same, stating, in relevant part:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheet. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired. Significant negative industry or economic trends, including the continued decline of traditional linear television viewership and linear ad revenues, disruptions to our business, inability to effectively integrate acquired businesses, underperformance of our content, unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and market capitalization declines ***may*** impair goodwill and other intangible assets. Any charges relating to such impairments ***could*** materially adversely affect our results of operations in the periods recognized.[3]

68.     These purported risk warning were generic, catch-all provisions that were not tailored to WBD's actual known risks regarding its sports rights negotiations with the NBA nor impairments to its Networks segment's goodwill, or that the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including the NBA, were likely to lead to billions of dollars in goodwill impairment charges.

69.     On April 19, 2024, WBD filed the 2024 Proxy with the SEC, wherein Defendants solicited shareholder votes – in advance of an annual stockholder meeting held on June 3, 2024 – in favor of numerous proposals, including the re-election of Defendants Zaslav, Chen, Fisher, Gould, Lowe, Malone, Merchant, and Price.

70.     The 2024 Proxy stated that WBD had adopted a Code of Conduct applicable to all representatives of WBD, including directors and officers.

71.     The 2024 Proxy states that "[w]hile each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed about such risks through committee reports and other presentations. Senior management is responsible for developing and implementing the Company's financial and strategic plans and

---

[3] Emphases added unless otherwise indicated.

identifying, evaluating, managing, and mitigating the risks inherent in those plans. Our Board is responsible for overseeing those plans, the associated risks, and the steps that senior management is taking to manage and mitigate risks." The 2024 Proxy, however, failed to disclose that the Company lacked sufficient controls, none of the Board Committees were adequately overseeing or charged with overseeing compliance with Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), and the Company was overstating its overall business and financial prospects.

72.     The 2024 Proxy failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting.

73.     According to the 2024 Proxy, certain of the Individual Defendants' compensation was tied to reported EBITDA growth, increase in network market share, integration and transformation projects, "oversight of significant debt reduction efforts", among other things.

74.     The 2024 Proxy also was false and misleading in that it failed to disclose that: (1) the Company lacked sufficient controls, including with respect to financial reporting; (2) contrary to the 2024 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements and violate Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), and thus the Defendants on the Board breached their fiduciary duties; and (3) the Defendants on the Board at that time who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

75.     The false and misleading elements of the 2024 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors.

76.    On May 9, 2024, the Company issued a press release announcing its first quarter 2024 financial results. Defendant Zaslav was quoted in the press release as stating, in relevant part, that "[w]e are pleased with our progress in the first quarter as evidenced by strong results in important [key performance indicators]" and that "[w]e continue to make bold moves to transform our company for the future as we position ourselves to take full advantage of the opportunities ahead."

77.    In a section detailing the Networks segment's highlights from the first quarter 2024, the press release provided, in relevant part:

- Networks operating expenses decreased 8% ex-FX to $3,006 million compared to the prior year quarter. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps(11)[.]
  - o Costs of revenues decreased 8% ex-FX, primarily driven by the AT&T SportsNet exit, the allocation of U.S. sports costs to DTC, as well as lower general entertainment content expense. These benefits were partially offset by the timing of domestic sports rights expense, unfavorable inflationary impacts in Argentina, and higher election expenses. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps.
  - o SG&A decreased 8% ex-FX, primarily driven by lower overhead expenses.

78.    Also on May 9, 2024, the Company hosted a conference call with analysts and investors to discuss first quarter 2024 results. During the call, Defendant Zaslav touted the Company's purported "confiden[ce] in the strength of our assets[,]" and that "we're more confident than ever in our assets and our playbook."

79.    With respect to WBD's negotiations with the NBA, Defendant Zaslav stated, in relevant part:

We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now, and we're hopeful that we'll be able to reach an agreement that makes sense for both sides.

We've had a lot of time to prepare for this negotiation, and we have strategies in

place for the various potential outcomes. However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them. With that in mind, please understand that this is as much as we're prepared to say about this topic today.

80.    Also during the call, Defendant Wiedenfels highlighted that WBD "continued [to] benefit from [*inter alia*] the [Company's] many initiatives to improve working capital, which we are still in the early innings of realizing", a "more disciplined and analytical approach to content investment and allocation", and "meaningfully lower cash restructuring costs."

81.    In discussing advertising trends, Defendant Wiedenfels stated, in relevant part, that "we did see sequential improvement [in] linear [markets] . . . in the first quarter" and "[t]otal company advertising in Q1 was down 7%, a sequential improvement of 300 basis points." Defendant Wiedenfels also asserted that the Company expected "another record quarter in Q2", which, "in part, reflects an increasingly more holistic portfolio approach to monetizing viewership on [*inter alia*] linear . . ., supporting our ability to offer our partners incremental reach and more customized ad solutions spanning all platforms, particularly in the US."

82.    In response to an analyst's question concerning WBD's "restructuring while navigating through the massive industry changes" and, "from a WBD point of view, what do you think the biggest surprises will be", as well as whether Defendants "can . . . give us your outlook for both sides, both [DTC] and linear", Defendant Zaslav stated, in relevant part:

[F]or us, it's really two tiers. One is we got rid of a lot of content we didn't think was going to help us. But at the same time, we brought in a lot of great creatives and invested a lot of content. So it's, how do we run these businesses efficiently for real free cash flow and drive for growth? But two, creative excellence. How do we have the best content?

In this past year, HBO had maybe its best year ever, and in addition to that, Warner Brothers Television has some of the best, highest quality TV production, and we're looking at our motion picture business now, which we're feeling really good about. It's number one to start the year, but we have a lot of great content. So I think it's

that combination.

Great content, great creatives, fighting to tell the best stories on every platform, and then running it like a real business. Real free cash flow and real EBIT [earnings before interest and taxes], and I think those two will drive us for the future.

83.    Defendant Wiedenfels added, in relevant part:

I would . . . say that we're operating in a much more constructive environment this year than we did last year. So hopefully, that'll be supportive.

To your point . . . about the differentiation between D2C and linear, well really one of the things that's working very well right now is that convergence. The way . . . the team take our inventory to the market is fully harmonized now. It's across platforms, incremental reach. We're leaning in further.

*            *            *

Longer term, there is definitely more opportunity here. We have been very transparent about the significant monetization difference between linear and digital advertising. [Defendant Zaslav] talked about AI a couple of minutes ago. Certainly that should be a helper longer term as we think about our go-to-market here, so definitely some upside.

*            *            *

We're seeing how we're running the company fundamentally differently that's not reflected in our current and near-term financials, and I think that's going to be the surprises.

84.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2024 (the "1Q24 10-Q"). The 1Q24 10-Q was signed by Defendants Zaslav and Wiedenfels, who each also provided certifications pursuant to the Sarbanes-Oxley Act of 2022.

85.    With respect to the Company's goodwill and intangible assets impairment analysis for the quarter, the 1Q24 10-Q stated, in relevant part:

During the three months ended March 31, 2024, the Company performed goodwill and intangible assets impairment monitoring procedures for all of its reporting units and identified no indicators of impairment or triggering events. As of October 1, 2023 . . . the Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The Company will continue to monitor its reporting units for triggers that could impact recoverability of goodwill.

These triggers include, but are not limited to, continued decline in the Company's market capitalization; affiliate and sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units; [and] declining levels of global GDP growth and soft advertising markets in the U.S. associated with the Company's Networks reporting unit[.]

86.     The 1Q24 10-Q contained substantively the same boilerplate purported risk warnings as contained in the 2023 10-K detailed above, regarding WBD's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed", while acknowledging that "our license for NBA programming is currently subject to renewal, and our exclusivity period with the NBA has expired" and, "[a]s a result, we face increased competition to license content from the NBA, which *could* result in significantly higher programming costs to us or a failure to maintain our license for NBA programming."

87.     The 1Q24 10-Q also contained boilerplate purported risk warnings regarding WBD's potential future "recogni[ition of] . . . impairment charges related to goodwill and other intangible assets", stating, in relevant part:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheets. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired . . . . The occurrence of certain events or circumstances *could* result in a downward revision in the estimated fair value of a reporting unit or intangible assets. For example, continued negative industry or economic trends, including the decline of traditional linear television viewership and linear ad revenues, declining levels of global GDP growth and soft advertising markets in the U.S., disruptions to our business, inability to effectively integrate acquired businesses, execution risk associated with anticipated growth in our DTC products, underperformance of our content, failure to renew content licenses and distribution agreements, including affiliate and sports rights renewals (including the NBA), unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and continued decline in our market capitalization *could* negatively affect our estimates of the fair value of our reporting units. When events or changes in circumstances such as this occur, we have needed to, and *may* in the future need to, write-down the value of our goodwill and other intangible assets. *If* we

determine that our estimate of the fair value of a reporting unit is below the recorded value of that unit on our balance sheet, we may record a non-cash impairment loss for the goodwill. Any charges relating to the impairment of our goodwill and other intangible assets ***could*** materially adversely affect our results of operations in the periods recognized.

We consider all current information when determining the need for, or calculating, any impairment loss. However, future changes in events or circumstances, such as a continuation or worsening of the current negative industry and economic trends and the other events and circumstances described above, ***could*** result in decreases in the fair value of our goodwill and other intangible assets and require us to record additional impairment losses that ***could*** materially adversely affect our results of operations in the periods recognized.

88.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose that: (i) negotiations for media rights with the NBA were causing, or likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) WBD's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) as a result, WBD faced an increasing likelihood of incurring billions of dollars in goodwill impairment charges; and (iv) as a result of the foregoing, WBD had overstated its overall business and financial prospects. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

89.    Similarly, the Individual Defendants violated, or caused the Company to violate, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), requiring the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Individual Defendants' failures to disclose, *inter alia*, that WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to

significantly reevaluate its business and goodwill, as well as that WBD's goodwill in its Networks segment had significantly deteriorated to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges, <u>violated Item</u> 303 because this issue represented a known trend or uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

90.    The truth emerged on August 7, 2024, when WBD issued a press release announcing its second quarter 2024 financial results. In the press release, WBD reported disappointing revenue of $9.71 billion, representing a 6.3% year-over-year decrease, as well as a net loss of approximately $10 billion resulting from a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects. Specifically, with respect to WBD's net loss during the quarter, the earnings release provided, in relevant part:

> Net loss available to [WBD] was $(10.0) billion, which includes a $9.1 billion noncash goodwill impairment charge from the Networks segment, as well as $2.1 billion of pre-tax acquisition-related amortization of intangibles, content fair value step-up, and restructuring expenses.
>
> • The goodwill impairment was triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA.

91.    Also on August 7, 2024, the Company hosted a conference call with analysts and investors to discuss second quarter 2024 financial results. During the call, Defendant Wiedenfels stated, in relevant part:

> Little more color on the Goodwill impairment. And to get straight to the point here, there is no one factor that is driving this impairment. So the way this works is obviously with the amount of goodwill that we have, there's a systematic process that we go through every quarter and we're monitoring for so-called triggering events.
>
> ***And this is clearly where a sports right discussion like the one with the NBA***

*comes into play as a triggering event, which then compels us to re-evaluate our business case* in a strategic planning process with the latest assumptions, the best view of where the industry is and how we play in that field. *And that's what then leads to evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment*. So it's really a full re-evaluation, not a response to one individual factor.

92.     On this news, the price of WBD's stock fell $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

93.     As a direct and proximate result of the Individual Defendants' misconduct, WBD has lost and expended, and will lose and expend, millions of dollars.

94.     Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Zaslav and Wiedenfels, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

95.     Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

96.     Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

98.     Plaintiff will adequately and fairly represent the interests of WBD and its shareholders in enforcing and prosecuting its rights.

99.     WBD is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

100.    Plaintiff is a current shareholder of WBD and was a continuous shareholder of the

Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

101.    A pre-suit demand on the Board of WBD is futile and, therefore, excused. At the time this action was commenced, the twelve-member Board consisted of Individual Defendants Zaslav, Di Piazza, Chen, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, and Yang (the "Director Defendants") as well as non-party Daniel E. Sanchez. Accordingly, Plaintiff need only show that demand is futile as to six current directors. As set forth below, all eleven Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

102.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

103.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

104.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully

prosecute such a suit even if they instituted it.

105.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of WBD, the Director Defendants knew, or should have known, the material facts surrounding the Company's negotiations with the NBA, as well as its goodwill and impairment charges.

106.    Defendant Zaslav is not disinterested or independent.  Defendant Zaslav serves as the Company's CEO and President.  Thus, the Company admits that Defendant Zaslav is a non-independent director.

107.    Moreover, each of the eleven Director Defendants signed the 2023 10-K. Defendant Zaslav also signed SOX Certifications that accompanied the 2023 10-K. The Director Defendants also signed the 2024 Proxy, which led to the reelection of Defendants Zaslav, Chen, Fisher, Gould, Lowe, Malone, Merchant, and Price, which allowed them to continue to breach their fiduciary duties to WBD.

108.    Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

109.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

110.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and

procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

111.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

112.    Defendants Price, Di Piazza, Lowe, and Merchant (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

113.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for

breaching their fiduciary duties, and therefore demand upon them is futile.

114.    Accordingly, a pre-suit demand on the Board is futile and excused.

### COUNT I

**Against the Director Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

117.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

118.    Under the direction and watch of the Director Defendants, the 2024 Proxy failed to disclose, *inter alia*: (1) contrary to the 2024 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties; and

(2) the Defendants on the Board at that time who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

119.    The 2024 Proxy failed to disclose that the Company lacked sufficient controls, none of the Board Committees were adequately overseeing or charged with overseeing compliance with Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), and the Company was overstating its overall business and financial prospects.

120.    The 2024 Proxy failed to disclose that the Company was violating Item 303, issuing false and misleading statements in violation of securities laws, and had failed to establish or maintain adequate internal controls. As a result, the 2024 Proxy was materially false and misleading.

121.    In the exercise of reasonable care, these Defendants should have known that the statements contained in the 2024 Proxy were materially false and misleading.

122.    The misrepresentations and omissions in the 2024 Proxy were material to Company stockholders in voting on the 2024 Proxy. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in the 2024 Proxy, including but not limited to the reelection of certain Director Defendants.  The 2024 Proxy was an essential link in Defendants' insulation from stockholder challenge.

123.    The false and misleading elements of the 2024 Proxy led to, among other things, the election of Zaslav, Chen, Fisher, Gould, Lowe, Malone, Merchant, and Price, which allowed them to continue to breach their fiduciary duties to WBD.

124.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the 2024 Proxy.

125.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II

**Against the Individual Defendants
For Breach of Fiduciary Duty**

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

128.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

129.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

130.    Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) negotiations for media rights with the NBA were causing, or likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) WBD's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to

affiliate and sports rights renewals, including with the NBA; (iii) as a result, WBD faced an increasing likelihood of incurring billions of dollars in goodwill impairment charges; and (iv) as a result of the foregoing, WBD had overstated its overall business and financial prospects. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

131.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

132.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

133.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

134.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

135.    Plaintiff, on behalf of WBD, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

138.    Plaintiff on behalf of WBD has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, WBD.

141.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from WBD that was tied to the performance or artificially inflated valuation of WBD, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

142.    Plaintiff, as a shareholder and a representative of WBD, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

143.    Plaintiff on behalf of WBD has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

146.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

147.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

148.    Plaintiff on behalf WBD has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all claims set forth herein.


DATED: December 23, 2024                    **RIGRODSKY LAW, P.A.**

                                                           By:   */s/ Vincent A. Licata*   _____
                                                                    Vincent A. Licata
                                                                    Timothy J. MacFall
                                                                    825 East Gate Boulevard, Suite 300
                                                                    Garden City, NY 11530
                                                                    Telephone: (516) 683-3516
                                                                    Email: vl@rl-legal.com
                                                                           tjm@rl-legal.com


                                                                    *Attorneys for Plaintiff*


**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place

1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com